UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------x

JAGUAR CARS, A Division of the Ford Motor
Company,

                                          Civ. No. 03CV12532RGS

                Plaintiff,

      - against -

LEE IMPORTED CARS, INC.,

                Defendant.

-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR (1) SUMMARY JUDGMENT ON ITS DECLARATORY JUDGMENT CLAIM AND (2) PARTIAL DISMISSAL OF DEFENDANT'S COUNTERCLAIMS

        Plaintiff Jaguar Cars, a Division of the Ford Motor Company ("Jaguar") respectfully submits this memorandum of law in support of its motion (i) pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment with respect to Jaguar's request for a declaratory judgment that it may add a Jaguar dealership in Norwood, Massachusetts without incurring liability to Defendant Lee Imported Cars, Inc. ("Lee"); and (ii) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Lee's Counterclaims for failure to state a claim upon which relief can be granted to the extent the Counterclaims seek relief by reason of Jaguar's establishment of the Norwood point.

### Preliminary Statement

        This case arises from Lee's desire to block the establishment of a Jaguar dealership to be located at 449 Neponset Street, Norwood, Massachusetts (the "Norwood point"). Lee operates a Jaguar dealership in Wellesley, Massachusetts at a site 10.5 miles

away from the Norwood point. While Massachusetts has enacted a statute that confers protest rights on existing dealers who may be affected by a new point, Lee has no standing under the statute because the Norwood point is outside Lee's statutorily-defined "relevant market area" -- i.e., the 8-mile radius around Lee's dealership. Lee also has no contractual right to object because the Dealer Agreement between Jaguar and Lee unambiguously provides that Lee is a "non-exclusive" dealer of Jaguar products.

Nevertheless, Lee has repeatedly threatened to sue Jaguar if it adds the Norwood point. In order to put an end to Lee's threats, Jaguar filed the instant declaratory judgment action. Lee has asserted a series of affirmative defenses and four counterclaims against Jaguar. As shown below, however, there is no genuine issue of material fact on the issue of whether Jaguar is entitled to establish a dealership in Norwood, and Jaguar is entitled to judgment on this issue as a matter of law.

## Statement of Facts

Jaguar, a division of the Ford Motor Company, is the exclusive authorized distributor in the United States of vehicles, parts, and accessories ("Jaguar Products") manufactured and sold by Jaguar Cars Limited in the United Kingdom. (Compl. ¶¶ 1, 11; Counterclaim ¶ 2.) Lee is an authorized Jaguar dealer with a facility located at 962 Worcester Road, Wellesley, Massachusetts 02482-3725. (Compl. ¶¶ 2, 6; Counterclaims ¶ 1, 3.) Lee's dealership is located in Norfolk County, Massachusetts. (Answer ¶ 4.)

Jaguar and Lee entered into a Dealer Agreement dated as of January 1, 1989 (the "Dealer Agreement") and the Jaguar Dealer Standard Provisions incorporated by reference therein (the "Standard Provisions"). (Compl. ¶ 13; Answer ¶ 13.) A copy of the Dealer Agreement and the Standard Provisions is attached as Exhibit 1 to the Declaration of George Delaney ("Delaney Decl."). Paragraph 1 of the Dealer Agreement appoints Lee as a "non-exclusive authorized dealer at the Dealership Facilities," which are defined as the facilities at 962 Worcester Road, Wellesley, Massachusetts 02482-

2

3725. (Delaney Decl., Ex. 1, ¶ 1.) Paragraph 2 of the Dealer Agreement further provides that the Dealer Agreement and the Standard Provisions "contain the entire agreement between the parties." (Delaney Decl. Ex. 1 ¶ 2.)

The Dealer Agreement and Standard Provisions contain no language restricting Jaguar's right to appoint other non-exclusive dealers. Nowhere in the Dealer Agreement or the Standard Provisions does Jaguar agree not to add dealerships within any distance from, or area surrounding, Lee. (See Delaney Decl., Ex. 1, passim.)

By letter dated August 25, 2003, Jaguar notified Lee that it had authorized the establishment of a Jaguar dealership to be located at 449 Neponset Street, Norwood, Massachusetts 02062. (Delaney Decl., ¶ 3, Ex. 2.) The August 25 letter noted that formal notification was not required by Massachusetts law because the "proposed site is more than 8 miles from your location" and therefore "your dealership falls outside the relevant market area definition" provided by statute. (Id.)

The Norwood location is, in fact, 10.5 miles from Lee's location. (Delaney Decl., ¶ 4, Ex. 3.) Thus, it clearly is not within a circle with a radius of 8 miles from any boundary of Lee's dealership.

Lee (or its legal representatives) sent letters to Jaguar dated September 9, 2003, October 16, 2003, and November 11, 2003, threatening to sue Jaguar over the Norwood point. (Delaney Decl., Exs. 4, 5, and 6.) Significantly, none of these letters claimed that the Norwood point was within 8 miles of Lee's dealership or that Lee had any statutory protest rights. Instead, the letters indicated that Lee would sue Jaguar based on various common-law theories. In light of this "actual controversy" with Lee, Jaguar filed the instant declaratory judgment action on December 17, 2003.

Jaguar seeks a declaration that it is entitled to establish the Norwood point because the point is not within Lee's statutory RMA and because the Dealer Agreement unambiguously gives Jaguar that right. (Complaint, ¶¶ 34-37.)

### Lee's Defenses and Counterclaims

Lee has asserted a series of affirmative defenses. (Answer, pp. 6-7.) The Answer pleads no facts in support of any of the affirmative defenses and, as shown in Point II below, none of these affirmative defenses has merit. In addition, Lee has asserted four counterclaims based on the following allegations:

Lee was "required" to execute a Performance Agreement dated November 23, 1987 for the construction of a new dealership and service facility "[a]s a condition to entering into a new franchise agreement." (Counterclaims, ¶ 4.) (A copy of the Performance Agreement referred to by Lee is annexed as Exhibit 7 to the Delaney Declaration.) The Performance Agreement required Lee to "spend significant money on advertising" and to participate in certain advertising programs. (Counterclaims, ¶ 5.)

Jaguar and Lee thereafter entered into the Dealer Agreement dated as of January 1, 1989. (Counterclaims, ¶ 6.) Lee cites three sections of the Standard Provisions in his Counterclaims (¶¶ 7-9):

> (i)     Section 7.2, in which Lee "acknowledges and agrees that [Jaguar] has appointed [Lee] . . . for the primary purpose of selling and servicing Jaguar Products in the market in which [Lee] is located (which, in the absence of a more specific definition, shall for the purposes of this Agreement mean the geographic area in which [Lee] is located and its immediate environs)";

> (ii)    Section 2.2, in which Jaguar agrees to "use its best efforts to assist [Lee] in the conduct of [Lee's] Jaguar Operations by providing a comprehensive range of support services . . . ."; and

> (iii)   Section 12, in which Lee agrees to participate in certain advertising programs.

Notably, Lee does not specifically allege a breach of any of these provisions, although Lee does suggest in Count I (¶ 37) that Jaguar breached Section 2.2.

4

Jaguar thereafter assigned to Lee an "area of primary sales responsibility" ("AOR"), which "initially included Norwood, Massachusetts 02062." (Counterclaims, ¶ 10.) A copy of the letter, dated October 22, 1993, pursuant to which Jaguar initially assigned this AOR to Lee, is annexed as Exhibit 8 to the Delaney Declaration. Lee claims that it made a "substantial, long-term investment" and "committed substantial resources" to developing "a customer base in the AOR," while Jaguar's expenditures for marketing "lagged significantly behind" those of "other luxury car manufacturers." (Counterclaims, ¶¶ 11-12.)

Lee further alleges that, in the 1999-2000 time frame, Jaguar informed Lee that it "intended" to locate a new dealership in Braintree. (Counterclaims, ¶¶ 15-17.) Based on Jaguar's "representations" concerning Braintree, Lee "continued to devote substantial resources to building its customer base in and around Norwood." (Id., ¶ 18.) Lee does not allege, however, that Jaguar made any contractual commitment or promise to locate a new dealer only in Braintree or not to locate one in Norwood

In 2003, Jaguar opened a dealership in Hanover, which "reduced Lee's AOR and interfered with its customer base and/or potential customers." (Id., ¶ 24.)

According to a document Lee received, as of January 2003 Lee's "average customer distance was 19.44 miles" and "a large percentage of Lee's customers were located in, or in close proximity to, Norwood." (Id., ¶ 20.) Jaguar's "own penetration figures for the year ending 1998" indicated that "Lee's highest market penetration is for customers located approximately ten (10) miles from the dealership." (Id., ¶ 28.) Lee alleges that the Norwood point (which the Counterclaims define as the "New Dealership") will have a "significant adverse effect on Lee's enterprise value and asset base" and will "interfere with Lee's existing customer base or potential customers." (Id., ¶ 30.)

Based on the foregoing allegations, Lee asserts four counterclaims:

1.      Breach of contract by "failing to assist Lee in further penetrating its AOR and by appointing the New Dealership in one of Lee's substantial customer bases" (Id., ¶ 38);

2.      Breach of the implied covenant of good faith and fair dealing by (a) failing to assist Lee in penetrating its AOR; (b) diminishing Lee's AOR; (c) "trying to benefit from" Lee's development of its customer base in the Norwood area; and (d) "seeking to appoint the New Dealership" (Id., ¶¶ 43-44);

3.      Interference with advantageous business relationships by "proposing to open the New Dealership" (Id., ¶ 48); and

4.      Violation of M.G.L.c. 93B (Id., ¶ 53).

The first three counterclaims are not viable to the extent they seek damages for the Norwood appointment, because Jaguar is acting pursuant to its contractual rights in making the appointment.  Lee's statutory claim must be dismissed because appointing a new dealer more than eight miles away from Lee does not violate Lee's rights under the statute.

## ARGUMENT

## I.     JAGUAR IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM

### A.     Applicable Legal Principles

A court may grant a motion for summary judgment if the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c) (2004); Celotex v. Catrett, 477 U.S. 317, 322 (1986); Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198, 201 (D. Mass. 2003).  When a motion for summary judgment is made and supported, the opposing party "may not rest upon mere allegations or denials," but

instead must set forth "specific facts," supported by competent evidence, "showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of some alleged factual dispute is insufficient; there must be a genuine issue of material fact. Anderson, 477 U.S. at 247-48 (emphasis added). A factual dispute is "material" only if it affects the outcome of the suit under governing law. Id. at 248.

As shown below, there is no genuine issue of material fact concerning Jaguar's right to establish a dealership in Norwood.

## B.    The Norwood Point Does Not Violate Any Statutory Right Of Lee

Massachusetts General Laws chapter 93B, section 6(a)(1), as amended, prohibits a motor vehicle manufacturer from granting a franchise agreement to a new dealer within the "relevant market area" of an existing dealer "without good cause, in bad faith or in an arbitrary or unconscionable manner." Mass. Gen. L. ch. 93B §§ 6(a)(1), 6(c) (amended 2002). Pursuant to the procedures set forth in the statute, an existing dealer may protest the addition of a new dealership if, but only if, the proposed new dealership is within its "relevant market area" ("RMA"). Section 1 defines "relevant market area," with respect to dealers located in Norfolk County, as "the entire land mass encompassed within a circle with a radius of 8 miles from any boundary of the dealership." Mass. Gen. L. ch. 93B § 1 (amended 2002).[1]

---

[1]    As noted by the Court in American Honda Motor Co. v. Richard Lundgren, Inc., 314 F.3d 17 (1st Cir. 2002), the legislature enacted the 2002 amendment to create a "bright line" rule to replace the former, "open-ended" test for an RMA which often engendered years of litigation simply to determine whether the dealer had statutory standing. Id. at 18-19. The current version of the statute went into effect on September 1, 2002. 2002 Mass. Legis. Serv. Ch. 222, § 7. The current version applies to "all franchise agreements existing on or after the effective date," unless the franchisor's notice concerning a new point "has or should have been delivered, as required by [former paragraph (l) of subsection (3) of section 4 of Chapter 93B] before the effective date of this Act." Id., § 5. Under former Ch. 93B, sec. 4(3)(l), the franchisor was required to send the notice 60 days prior to entering into the new franchise agreement. Since Jaguar did not enter into a franchise agreement for the Norwood point within 60 days of September 1, 2002, the current version of the statute clearly applies here.

There can be no genuine dispute that the Norwood point is well outside of Lee's RMA. Prior to notifying Lee of the Norwood point, Jaguar asked Urban Science Applications, Inc. ("USAI"), a nationally recognized consultant to the automotive industry, to determine the distance between various points in the Boston market, including the distance between Lee's dealership and the Norwood point. Using the actual street addresses of the dealerships, USAI determined that the distance between Lee and the Norwood point is 10.5 miles. (Delaney Decl., ¶ 4, Ex. 3.)

Accordingly, the Court should grant summary judgment in Jaguar's favor and declare that the Norwood point does not violate Lee's rights under the statute. See, e.g., American Honda Motor Co. v. Bernardi's, Inc., 188 F. Supp. 2d 27, 32 (D. Mass. 2002); aff'd, American Honda Motor Co. v. Richard Lundregen, Inc., 314 F.3d 17, 24 (1st Cir. 2002) (granting summary judgment in manufacturer's favor on declaratory judgment claim where dealer could not demonstrate that proposed dealership was within its RMA under an earlier version of the statute).

### C.    Jaguar Has The Contractual Right To Add The Norwood Point

The Dealer Agreement appoints Lee "as a <u>non-exclusive</u> authorized dealer in Jaguar Products at the Dealership Facilities." (Delaney Decl., Ex. 1, ¶ 1, emphasis added.) This language has been held, in a Florida case, clearly to preserve Jaguar's right to appoint additional dealers:

> The Dealer Agreement clearly does not make [the dealer] the exclusive authorized Jaguar dealer in its location. To the contrary, it appointed [the dealer] "as a non-exclusive authorized dealer in Jaguar Products at the Dealership Facilities." . . . .. If Jaguar was agreeing not to add dealerships within a certain distance of [the dealer], the Dealer Agreement would say so.

Crown Auto Dealerships, Inc. v. Jaguar Cars, No. 96-4657, 1996 WL1060445 (Fla. Div. Admin. Hrgs. Dec. 18, 1996), adopted by Order dated March 19, 1997, aff'd, 702 So.2d

492 (Fla. App. 1 Dist. 1997) (table) (a copy of the decision is attached hereto as Exhibit A).

Moreover, courts construing similar language in other automobile franchise agreements have consistently and repeatedly held that appointment as a "non-exclusive" dealer forecloses claims of territorial exclusivity. See, e.g., Sandhill Motors, Inc. v. American Motors Sales Corp., 667 F.2d 1112, 1113 n.3 (4th Cir. 1981) (recognizing that a dealer agreement stating that "Dealer shall have the non-exclusive right" to purchase and resell the manufacturer's products foreclosed a common law challenge to the appointment of a new franchisee in the dealer's market, since "the dealer franchise agreement explicitly provided that it was non-exclusive"); Harley-Davidson Motor Co. v. Motor Sport, Inc., 6 F. Supp. 2d 996, 1001 (E.D. Wis. 1998) (holding that the appointment of a motorcycle dealer as a "non-exclusive distributor" of motorcycles was "clear and unambiguous" in giving the manufacturer the right to appoint additional distributors); Midwest Great Dane Trailers, Inc. v. Great Dane Limited Partnership, 977 F. Supp. 1386 (D. Minn. 1997) (holding that dealership agreement stating that "Distributor does not have the exclusive right to sell Great Dane products within such territory" did not prohibit manufacturer from appointing an additional dealer within Midwest's area of responsibility).

Further, as this Court recently observed in granting summary judgment dismissing a distributor's claim concerning its manufacturer's appointment of a competing distributor:  "As a general statement, absent a specific agreement otherwise, the mere fact that a distributorship agreement exists does not prevent the manufacturer from adding additional distributors in a given area." Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198, 208 (D. Mass. 2003) (Stearns, J., adopting magistrate's report and recommendation.)

In its Counterclaims, Lee points out that Norwood has been within Lee's "area of primary sales responsibility" ("AOR") since Jaguar initially assigned an AOR to Lee (Counterclaim, ¶¶ 10, 19, 22). Notably, however, Lee does <u>not</u> allege anywhere that it has any contractual right to keep Norwood within its AOR -- and for good reason. Jaguar initially assigned an AOR to Lee in 1993, several years after the Dealer Agreement was signed, under cover of a letter, which stated in pertinent part:

> Obviously, AOR's are changeable, depending on such things as sales performance and <u>the addition</u>, deletion, or relocation <u>of dealers</u>. In addition, we, of course, <u>reserve the right to redefine AOR's</u> in accordance with such reasonable criteria as we develop from time to time.

(Delaney Decl., Ex. 8, p.2, emphasis added.) Moreover, the Standard Provisions state that "nothing in this Agreement limits Dealer as to the geographic area into which, or the persons to whom, Dealer may sell Jaguar products" (Delaney Decl., Ex. 1, Standard Provisions, ¶ 7.2) -- making it clear that Jaguar dealers do not have exclusive sales territories. In short, Jaguar's creation of AOR's in 1993 did not affect the non-exclusive status afforded by the Dealer Agreement. <u>See Crown Auto Dealerships, Inc.</u>, 1996 WL 1060445, at *1.

In sum, there is no genuine issue of material fact with respect to Jaguar's right to establish a dealership in Norwood. Jaguar is entitled to summary judgment on its declaratory judgment claim.

## II.    LEE'S AFFIRMATIVE DEFENSES ARE WITHOUT MERIT

Lee has asserted eight affirmative defenses. (Answer, pp. 6-7.) Since Lee bears the burden of proof on its affirmative defenses, Jaguar is not required to negate them with evidentiary submissions. <u>See Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 884-85 (1990). Nevertheless, Jaguar will point out here the reasons why these defenses lack merit.

Lee contends that Jaguar has failed to state a claim or to present a ripe, justiciable, "actual" case or controversy between the parties under 28 U.S.C. § 2201 (First, Third, and Eighth Defenses). These defenses are rebutted by Point I above; by Lee's repeated threats to sue Jaguar (Delaney Decl., Exs. 4, 5, and 6); and, most conclusively, by Lee's own Counterclaims in this action.

Lee itself alleges that there is diversity of citizenship. (See Counterclaims, ¶¶ 1-2). Thus, Lee's denial of jurisdiction under 28 U.S.C. § 1332 (Second Defense) could only have merit if Lee were to admit that its own claims for damages could not possibly exceed $75,000: in a declaratory judgment action, the "amount in controversy" requirement is satisfied if plaintiff could be liable to the defendant for more than $75,000 as the result of an adverse decision. Budget Rent-A-Car, Inc. v. Higashiguchi, 109 F.3d 1471, 1473 (9th Cir. 1997).[2] Since Lee obviously considers Jaguar's liability to exceed $75,000, any purported dispute about the amount in controversy is not genuine.

Next, Lee alleges alternatively that (i) the Norwood point is within Lee's RMA under M.G.L.c. 93B, or (ii) the statute is irrational in restricting an RMA to eight miles, or (iii) the statute doesn't restrict an RMA to eight miles. (Fifth, Sixth and Seventh Defenses respectively.) The "Fifth" and "Seventh" defenses are refuted by Point I above, and the Sixth is clearly meritless in light of the legislature's broad power to regulate in the economic sphere. See 2 R. Rotunda & J. Nowak, Treatise on Constitutional Law, § 15.4, at 604-09 (3d ed. 1999) ("judicial deference to the legislature's economic regulations [has become] virtually complete" under modern Supreme Court precedents).

Finally, there are no allegations that Jaguar intentionally and fraudulently induced Lee to act to its detriment, as required to successfully assert estoppel (Fourth

---

[2]     Of course, even if Lee were to take this position -- which it won't -- Jaguar is prepared to prove that Jaguar itself will suffer over $75,000 in damages if not permitted to open the Norwood point.

Defense). See Dunkin' Donuts Inc. v. Panagakos, 5 F. Supp. 2d 57, 61 (D. Mass. 1998) (elements of estoppel). Nowhere does Lee allege that Jaguar ever promised that it would not add a dealership in Norwood or would not change Lee's AOR, and Jaguar reserved the right to do just that in the written documents.

In sum, the Affirmative Defenses present no genuine issue of material fact.

## III.    LEE'S COUNTERCLAIMS SHOULD BE DISMISSED TO THE EXTENT THEY ARE BASED ON THE NORWOOD POINT

### A.    Applicable Legal Standard

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must of course assume that all of the well-pleaded factual allegations are true and view the facts in the light most favorable to the pleader. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Court, however, need not accept as true legal conclusions or unwarranted factual inferences. Moreover, where, as here, the pleader has incorporated documents by reference into the pleading, the Court may consider the actual contents of those documents and need not accept the pleader's characterizations if they are inconsistent with such contents. See, e.g., Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1014-15 (1st Cir.) (considering allegedly libelous article submitted by defendants with motion to dismiss), cert. denied 488 U.S. 821 (1988); Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 2001 WL 1181103 (1st Cir. 2001) (stating that on a motion to dismiss for failure to state claim, district court may consider documents the authenticity of which are not disputed by parties, official public records, documents central to plaintiffs' claim, or documents sufficiently referred to in the complaint).

Further, if the Court decides to consider the materials presented in support of Jaguar's motion for summary judgment in ruling on the motion to dismiss the

Counterclaims, the Court may convert the latter motion into one for summary judgment pursuant to Rule 12(b).

In its Counterclaims, Lee attempts to mix a claim that Jaguar breached a contractual obligation to provide sufficient marketing support with its attack on the Norwood point. The two claims, however, are legally distinct. Even if Jaguar's alleged failure to provide agreed-upon marketing and other support may be the basis of a claim for damages, it is not a basis for any relief with respect to Jaguar's exercise of its contractual right to establish a dealership in Norwood. Thus, the Counterclaims must be dismissed to the extent that they are based on the Norwood point.

### B.    Breach of Contract (Count I)

The Counterclaims do not point to any contractual provision that Jaguar is allegedly breaching by establishing the Norwood point and, as shown above, Jaguar clearly has the right under the Dealer Agreement to appoint the new dealer. Accordingly, Count I should be dismissed to the extent it alleges that Jaguar has breached its contract "by appointing the New Dealership in one of Lee's substantial customer bases" (Counterclaim, ¶ 38).

### C.    Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

Lee alleges that Jaguar "breached the implied covenant of good faith and fair dealing" by "failing to assist Lee in further penetrating its AOR, by repeatedly diminishing Lee's AOR, and by trying to benefit from Lee's development of its customer base in areas in which Jaguar is placing the New Dealership." (Counterclaims, ¶ 43.) Lee further alleges that "Jaguar's actions in seeking to appoint the New Dealership, which will severely and adversely impact Lee's customer base, are not advanced in good faith." (Id., ¶ 44.)

13

As a matter of law, however, Jaguar's decision to appoint a new dealer in Norwood (and consequently to change Lee's AOR) cannot constitute a breach of the implied covenant of good faith and fair dealing. The Dealer Agreement expressly states that Lee is a non-exclusive dealer. (Delaney Decl. Ex. A ¶ 1.)  The covenant of good faith and fair dealing cannot be invoked to override the express terms of the contract. See, e.g., Dunkin' Donuts Inc. v. Gay-Stra Donuts, Inc., 139 F. Supp. 2d 147, 156 (D. Mass. 2001).

For example, Dunkin' Donuts Inc. v. Panagakos, 5 F. Supp. 2d 57, 64 (D. Mass. 1998) (Stearns, J.), this Court held that the implied covenant of good faith and fair dealing cannot create territorial rights where none exist in the franchise contract.  There, Dunkin' Donuts sued to terminate a franchisee, and one of the franchisee's counterclaims was that Dunkin' Donuts breached the implied covenant by allowing a new Dunkin' Donuts shop to open "in the area served by" one of the franchisee's shops.  The Court noted that the franchise agreement "state[d] that Dunkin' Donuts 'in its sole discretion, has the right to operate or franchise other DUNKIN' DONUT SHOPS . . . on such terms and conditions as DUNKIN DONUTS deems acceptable,'" and further provided that the franchisee's "licenses were 'non-exclusive' and that each franchise received a license to operate at 'one location only.'" Id. at 64, n.19.  This Court observed that "the weight of authority holds that the good faith covenant cannot create territorial rights for a franchisee in the face of contractual language similar or identical to that found in [the Dunkin' Donuts] franchise agreement." Id. at 64.

In light of the numerous authorities holding that a "non-exclusive" franchise agreement grants no territorial rights and entitles the franchisor to appoint other dealers (see Point I(C) above), the Panagakos rationale applies here.  The implied covenant claim should be dismissed.

14

D.    **Intentional Interference With Advantageous
       Business Relations (Count III)**

To state a valid claim for intentional interference with advantageous business relations, a claimant must plead facts showing: (1) the existence of a business relationship or contemplated contract of economic benefit; (2) respondent's knowledge of such relationship; (3) respondent's intentional interference with that relationship through improper motives or means; and (4) claimant's loss of advantage as a direct result of respondent's conduct. See, e.g., James L. Miniter Ins. Agency, Inc. v. Ohio Indemnity Co., 112 F.3d 1240, 1250 (1st Cir. 1997); American Private Line Servs., Inc. v. Eastern Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992); Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F. Supp. 404, 421 (D. Mass. 1995); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817, 551 N.E.2d 20 (1990).

Focusing first on the last element, the only "loss of advantage" that Lee has suffered from Jaguar's appointment of a Norwood dealership (which has not yet opened) is the loss of the "right" to be free from competition in that area or, to put it another way, an alleged diminution in the amount of future prospective sales because Lee no longer has this area "exclusively" to itself.[3]  As shown above, however, the Dealer Agreement negates any such alleged "right" to territorial exclusivity; Lee does not "own" the retail customers in the Norwood area, and the tort of interference cannot be used to create a territorial right that the contract negates.

Moreover, the courts have repeatedly held that the "improper motives or means" element of the tort cannot be satisfied where, as here, a manufacturer or a franchisor seeks to increase sales or otherwise act for its own financial gain by appointing new franchisees or distributors in competition with its existing franchisees or distributors, provided that the conduct does not conflict with the applicable franchise or distribution

---

[3]     Of course, the addition of new dealer points can have the opposite effect, increasing sales for all area dealers because of increased awareness of the brand, customer convenience, and enhanced reputation.

agreement.  See Boyle v. Douglas Dynamics, Inc., 292 F.Supp.2d 198, 214 (D. Mass. 2003) (Stearns, J., adopting magistrate's report and recommendation) (rejecting claim of tortious interference by plaintiff-distributor who alleged that defendant-manufacturer appointed plaintiff's largest customer as an additional distributor, thereby making plaintiff's customer its direct competitor); Rosenberg v. Pillsbury Co., 718 F.Supp. 1146, 1158 (S.D.N.Y. 1989) (applying Massachusetts law) (rejecting claim of tortious interference by Haagen-Dazs franchisees who alleged that the company's decision to sell its ice cream to supermarkets had contributed to the failure of plaintiffs' Haagen-Dazs shops).

As the court cogently observed in Rosenberg, where the franchisor is exercising its rights under the franchise agreement, its acts are "done with right or justifiable cause" as a matter of law, and therefore "plaintiffs cannot meet the third essential element of the tort."  718 F. Supp. at 1158; see also Blair v. General Motors Corp., 838 F. Supp. 1196, 1200-01 (W.D. Ky. 1993) (Rule 12(b)(6) dismissal granted where automobile manufacturer exercised its contractual right of first refusal under dealer agreement to block dealer's contract to sell the franchise to plaintiff); Wright v. Metrohealth Medical Ctr., 58 F.3d 1130, 1138-39 (6th Cir. 1995) (affirming 12(b)(6) dismissal where defendant requested contractor to fire an employee pursuant to defendant's rights under contract).

Here, Lee has not alleged an improper motive by Jaguar or the use of improper means to interfere with Lee's relationship with purchasers of Jaguar Products. Lee merely alleges that Jaguar "knowingly and intentionally interfered with Lee's current and prospective business relationships with customers by proposing to open the New Dealership within Lee's AOR in Norwood, Massachusetts."  (Counterclaims, ¶ 48.) Under the above authorities, this allegation is clearly insufficient.

E.     **Violation of M.G.L.c. 93B (Count IV)**

As discussed in section I(B) above, the Norwood dealership is not within Lee's relevant market area.  Therefore, Lee has no standing to protest the addition of the new dealer in Norwood and his claim under Massachusetts General Laws chapter 93B should be dismissed with prejudice as a matter of law.

## CONCLUSION

For all of the foregoing reasons, Jaguar's motion for summary judgment on its declaratory judgment claim, and its motion to dismiss the Counterclaims to the extent they are based on the establishment of the Norwood point should be granted.

Dated: New York, New York
        February 27, 2004

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP


By: _____
    Sarah C. Kellogg (BBO# 637530)
    75 State Street
    Boston, Massachusetts 02109

KIRKPATRICK & LOCKHART LLP

Carl J. Chiappa
John J. Sullivan
599 Lexington Avenue
(212) 536-3900

Attorneys for Jaguar Cars, a Division of the Ford Motor Company

17

# Exhibit A

Citation              Found Document        Rank(R) 1 of 1      Database
1996 WL 1060445                                                 FL-ADMIN
**(Cite as: 1996 WL 1060445 (Fla.Div.Admin.Hrgs.))**

Division of Administrative Hearings
State of Florida

**\*1** CROWN AUTO DEALERSHIPS, INC., d/b/a CROWN JAGUAR, Petitioner
v.
JAGUAR CARS, a division of FORD MOTOR COMPANY, Respondent
Case No. 96-4657
December 18, 1996

RECOMMENDED ORDER OF DISMISSAL

1. On October 16, 1996, the Respondent (Jaguar) filed a Motion to Dismiss
Complaint in this case. On October 23, 1996, the Petitioner (Crown) filed a
Response to Motion to Dismiss. The Motion to Dismiss Complaint was heard on
October 29, 1996. On November 5, 1996, Jaguar filed its Supplemental Memorandum
in Support of Motion to Dismiss Complaint, and Crown's response was filed on
November 8, 1996. All of the written and oral arguments have been considered.
(The Department presented no arguments, either written or oral, to indicate its
position.)

2. Crown's Complaint was filed under Sections 320.641 and 320.699, Fla. Stat.
(1995). It alleged that, by letter dated July 1, 1996, Jaguar gave Crown notice
of its intent to change the "geographic Area of Primary Sales Responsibility
("AOR") that has been assigned to [Crown's] dealership." Crown further alleged
that the change in its AOR constituted a change in the Dealer Agreement between
Jaguar and Crown in that it would change Crown's market and allegedly enable
Jaguar to add another dealership in Crown's market area assigned by the Dealer
Agreement. Finally, Crown alleged that Jaguar did not follow the procedures for
modifying the Dealer Agreement set out in Section 320.641(1)(a), Fla. Stat.
(1995).

3. Jaguar's Motion to Dismiss Complaint is based primarily on the arguments
(1) that the Dealer Agreement does not limit Jaguar's ability to add dealerships
and (2) that a change in Crown's AOR is not a modification of the Dealer
Agreement.

4. The validity of Jaguar's arguments turns on whether the Dealer Agreement is
clear and unambiguous so as to preclude Crown's extrinsic evidence to prove the
contrary under the parol evidence rule. The Dealer Agreement states in part:
"The Company [Jaguar] hereby appoints the Dealer [Crown] as a non-exclusive
authorized dealer in Jaguar Products at the Dealership Facilities." (Emphasis
added.) This appointment clearly does not make Crown the exclusive authorized
Jaguar dealer in its location. See BMW of North Amer., Inc., v. New Motor
Vehicle Board, et al., 162 Cal.App.3d 980 (Cal. 3d Ct. App. 1984); Kinn v. Coast
Catamaran Corp., 582 F.Supp. 682 (E.D. Wis. 1984).

5. It seems clear that, if Jaguar was agreeing not to add dealerships within a
certain distance of Crown, notwithstanding the clear language of the non-
exclusive appointment, the Dealer Agreement would say so explicitly. Yet,
nowhere in the Dealer Agreement does Jaguar agree not to add dealerships within
a certain distance of Crown.

6. Crown makes several arguments why the Dealer Agreement should not be viewed
as being clear and unambiguous.

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

1996 WL 1060445
(Cite as: 1996 WL 1060445, *1 (Fla.Div.Admin.Hrgs.))

   7. First, Crown proposes that the "non-exclusive" appointment was intended to
convey only that Crown would be permitted to sell another automobile line-
make's products "at the Dealership Facilities." In a Performance Agreement,
which is incorporated in the Dealer Agreement, Crown agreed to build a new
dealership facility and to "design and construct an exclusive Jaguar sales and
service wing." However, the Performance Agreement also contemplated that Crown
could use the "exclusive Jaguar sales and service wing" to sell and service the
automobiles of other line-makes, for it included the caveat that, should Crown
do so, Crown's Jaguar vehicle allocation would be adjusted. But it is concluded,
as a matter of law, that the provisions in the Performance Agreement for "an
exclusive Jaguar sales and service wing" do not create ambiguity as to the
meaning of the appointment of Crown "as a non-exclusive authorized dealer in
[Jaguar Products] at the Dealership Facilities." [Emphasis added.]
   *2 8. Second, Crown proposes that Article 7 of the Standard Provisions of the
Dealer Agreement creates ambiguity as to the meaning of the appointment of Crown
"as a non-exclusive authorized dealer in Jaguar Products at the Dealership
Facilities." Article 7.2 provides:
   Dealer acknowledges and agrees that the Company has appointed Dealer as an
authorized Dealer in Jaguar Products at the Dealership Facilities for the
primary purpose of selling and servicing Jaguar Products in the market in which
Dealer is located (which, in the absence of a more specific definition, shall
for the purposes of this Agreement mean the geographic area in which Dealer is
located and its immediate environs. While nothing in this Agreement limits
Dealer as to the geographic area into which, or the persons to whom, Dealer may
sell Jaguar Products, Dealer acknowledges that it has assumed the obligation of
selling and servicing Jaguar Products in [its] market.
[Emphasis added.] While Article 7.2 refers to Crown's "market," it does not
indicate in any way that Crown's market was intended to be exclusive. To the
contrary, it refers to Crown as "an authorized Dealer" in its market, not as the
authorized dealer in the market. Similarly, while Article 7.3 requires that a
dealer "use its best efforts to achieve the best sales performance possible in
the market it has been appointed to serve," it also alludes to the existence of
"certain multi-dealer markets" and provides that performance of a dealer in
those markets will be evaluated based on a dealer's penetration "in that portion
of its market which the Company determines is most conveniently served by Dealer
. . .
   9. Finally, Crown proposes that the New Vehicle Allocation System in the Dealer
Agreement creates ambiguity as to the meaning of the appointment of Crown "as a
non-exclusive authorized dealer in Jaguar Products at the Dealership
Facilities." Crown argues that the New Vehicle Allocation System ties into
Article 7 of the Standard Provisions and defines Crown's "market" more
specifically as a 75-mile radius from Crown's facility. To the contrary, by its
terms, the "Seventy-Five Mile Radius Rule" in the New Vehicle Allocation System
relates only to the new vehicle allocation computation. But even if it defined
Crown's "market," it would do nothing to make that "market" any more exclusive
than Article 7 of the Standard Provisions does.
   10. In conclusion, the Dealer Agreement clearly does not make Crown the
exclusive authorized Jaguar dealer in its location. To the contrary, it
appointed Crown "as a non-exclusive authorized dealer in Jaguar Products at the
Dealership Facilities." (Emphasis added.) If Jaguar was agreeing not to add

Westlaw

```
1996 WL 1060445
(Cite as: 1996 WL 1060445, *2 (Fla.Div.Admin.Hrgs.))
```

dealerships within a certain distance of Crown, the Dealer Agreement would say so. There being no ambiguity in the Dealer Agreement, the parol evidence rule precludes Crown from alleging and proving the contrary by use of extrinsic evidence. See BMW of North Amer., Inc., v. New Motor Vehicle Board, et al., supra; Kinn v. Coast Catamaran Corp., supra.

*3 11. It also is clear from the Dealer Agreement that a change in Crown's AOR has no impact whatsoever on the new vehicle allocation computation under the New Vehicle Allocation System. (Indeed, Crown makes no allegation that it does.) The only change in the Dealer Agreement effected by the intended change in Crown's AOR would be to [reduce] the extent of Crown's sales and service obligations under Article 7 of the Standard Provisions of the Dealer Agreement. It is concluded as a matter of law that such a [reduction] in Crown's sales and service obligations cannot "[adversely] alter the rights or obligations of a motor vehicle dealer under an existing franchise agreement or will substantially impair the sales, service obligations, or investment of the motor vehicle dealer" so as to require Jaguar to follow the procedures for modifying the Dealer Agreement set out in Section 320.641(1)(a), Fla. Stat. (1995). [Emphasis added.] (Again, Crown makes no allegation that it does.)

## RECOMMENDATION

Based upon the foregoing Findings of Fact and Conclusions of Law, it is RECOMMENDED that the Department of Highway Safety and Motor Vehicles enter the final order dismissing Crown's Complaint.

RECOMMENDED this 18th day of December, 1996, in Tallahassee, Florida.

```
J. LAWRENCE JOHNSTON,
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida 32399-3060
```

Filed with the Clerk of the Division of Administrative Hearings this 18th day of December, 1996.

## NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions within 15 days from the date of this Recommended Order of Dismissal. Any exceptions to this Recommended Order of Dismissal should be filed with the agency that will issue the final order in this case.

1996 WL 1060445 (Fla.Div.Admin.Hrgs.)
END OF DOCUMENT

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw