UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RECEIVED
Clerk's Office
USDC, Mass.
Date 4-5-04
By _____
Deputy Clerk

| | |
|---|---|
| JAGUAR CARS, a Division of the Ford Motor Company,<br>    Plaintiff,<br><br>v.<br><br>LEE IMPORTED CARS, INC.,<br>    Defendant/Third-Party Plaintiff,<br><br>v.<br><br>JOHN DOE,<br>    Being the Fictitious Name of<br>    Third-Party Defendant. | Civil Action No. 03CV12532RGS |

## AFFIDAVIT OF CHRISTOPHER J. LEE

I, Christopher J. Lee, on oath hereby depose and state as follows:

1.   I am President of Lee Imported Cars, Inc. ("Lee"), a Massachusetts corporation with a principal place of business at 962 Worcester Road, Wellesley, Massachusetts 02482. I have served as Lee's President since its inception in 1968. This Affidavit is based upon facts which are personally known by me and/or upon records and other documents reviewed by me.

2.   Lee has been a franchisee of Jaguar Cars Inc. since 1974. Upon information and belief, Jaguar Cars, a Division of the Ford Motor Company, is the successor-in-interest to Jaguar Cars Inc. (Jaguar Cars, a Division of the Ford Motor Company, and Jaguar Cars Inc. will be collectively referred to as "Jaguar").

3.      In or about 1987, after Lee served as a Jaguar franchisee for approximately thirteen (13) years, Jaguar threatened to terminate the franchise agreement unless Lee agreed to construct a new dealership and service facility. Given the respective bargaining power of the two entities, and out of fear of losing the Jaguar franchise, Lee agreed to spend in excess of $6 million on a build-out, so that it could continue to operate the Jaguar franchise in its assigned area of responsibility ("AOR").

4.      As a condition to entering into the new franchise agreement, Lee was required to execute a Performance Agreement dated November 23, 1987 ("Performance Agreement") for the construction of the new building and service facility. A copy of the Performance Agreement is attached to the Declaration of George Delaney ("Delaney Declaration") submitted by Jaguar, Exhibit 7. Jaguar represented to Lee that it could keep its franchise and assigned AOR if it agreed to build a new facility.

5.      The Performance Agreement required, *inter alia*, that Lee agree to budget and spend significant money on advertising and also agree to participate in Jaguar's National Co-Operative Advertising and Major Metro Programs. The Performance Agreement also required that Lee not add any additional lines or makes of automobiles. Delaney Declaration, Exhibit 7.

6.      Lee and Jaguar then entered into a new Dealer Agreement dated as of January 1, 1989, which incorporates the "Dealer Agreement Standard Provisions" and exhibits thereto (collectively, "Dealer Agreement"). A copy of the Dealer Agreement is attached to the Delaney Declaration, Exhibit 1.

7.      Although the Dealer Agreement provides that Lee is a "non-exclusive authorized dealer," Section 7.2 of the Dealer Agreement Standard Provisions further provides:

> [Lee] acknowledges and agrees that [Jaguar] has appointed [Lee]
> as an authorized Dealer in Jaguar Products at the Dealership

>Facilities for **the primary purpose of selling and servicing Jaguar Products in the market in which [Lee] is located (which, in the absence of a more specific definition, shall for the purposes of this Agreement mean the geographic area in which [Lee] is located and its immediate environs)**. While nothing in this Agreement limits [Lee] as to the geographic area into which, or the persons to whom, [Lee] may sell Jaguar Products, [Lee] acknowledges that it has assumed the obligation of selling and servicing Jaguar Products in its market (emphasis added).

Delaney Declaration, Exhibit 1.

8.  The Dealer Agreement also provides that it "is to be governed by, and construed in accordance with, the laws of the state in which [Lee] is located," i.e., Massachusetts. Delaney Declaration, Exhibit 1.

9.  Based upon Lee's fifteen year history as a Jaguar franchisee prior to the time it executed the new Dealer Agreement, Lee understood its market as provided in the Dealer Agreement to be the AOR previously assigned to it, which consisted of not only Norwood, Massachusetts, but the vast majority of Massachusetts located south of Boston. AOR maps previously provided by Jaguar to Lee dating back to at least 1982 confirm the specific territories assigned to Lee and include Norwood, Massachusetts. A true and accurate copy of one AOR map from 1982 is attached hereto as Exhibit "A." Jaguar also represented that Lee would be able to keep its territory.

10.  At the time Lee entered into the Dealer Agreement, its understanding was that its "market" and "immediate environs" as defined by that agreement included the AOR previously assigned to it and which it had been cultivating for approximately fifteen (15) years. Lee would not have committed in excess of $6 million to build a new facility if it did not have the benefit of the previously assigned market.

11.     In addition, based upon M.G.L. c. 93B, which was enacted to protect automobile dealers such as Lee and which was in effect from the inception of Lee's franchise through Lee's execution of the Dealer Agreement, Lee understood that, at a minimum, its "market" included the statutorily defined relevant market area. The statutorily defined relevant market area included the geographic region wherein two-thirds of Lee's retail sales or retail service sales occurred notwithstanding what its assigned AOR was. Based upon Lee's fifteen (15) year history as a Jaguar franchisee, Norwood, Massachusetts clearly fell within its relevant market area as construed by Massachusetts law at the time the Dealer Agreement was executed.

12.     At the time Lee executed the new Dealer Agreement in 1989, and through present day, Norwood, Massachusetts is within the geographic area within which two-thirds of Lee's retail sales or retail service sales occur. At the time Lee executed the Dealer Agreement in 1989, Norwood, Massachusetts 02062 was not only part of its AOR, but was well within what Lee believed was its statutorily protected area.

13.     Section 2.2 of the Dealer Agreement Standard Provisions also provides, in pertinent part, that "[Jaguar] will use its best efforts to assist [Lee] in the conduct of [Lee's] Jaguar Operations by providing a comprehensive range of support services . . . ."

14.     In accordance with the Dealer Agreement and Performance Agreement, Lee made a substantial, long-term investment in its property, plant and equipment, and continued developing a customer base in its AOR to which it committed substantial resources.

15.     In accordance with the Dealer Agreement, Lee also sought Jaguar's assistance and support in committing additional resources to marketing the Jaguar brand as Jaguar's expenditures significantly lagged behind that of other luxury car manufacturers.

16.   By letter dated October 22, 1993, Jaguar attempted to unilaterally redefine Lee's AOR and to alter the territory which Lee believed it acquired by virtue of the Dealer Agreement and prior course of dealing with Jaguar. The letter included the self-serving language that:

> Obviously, AOR's are changeable, depending on such things as sales performance and the addition, deletion or relocation of dealers. In addition, we, of course, reserve the right to redefine AOR's in accordance with such reasonable criteria as we develop from time to time.

A copy of the October 22, 1993 letter is attached to the Delaney Declaration, Exhibit 8. Lee never accepted Jaguar's attempt to unilaterally redefine the parties' agreement.

17.   In 1999, Jaguar apparently began exploring the possibility of locating a new dealership to service Boston, Massachusetts and areas to its south.

18.   Upon learning of Jaguar's plan to add a dealership within Lee's AOR, Lee voiced concern that Jaguar was intruding upon Lee's bargained for AOR and again reiterated its position to Jaguar that it should commit additional resources to marketing and supporting the Jaguar brand rather than attempting to further penetrate the market by adding a new dealership in Lee's AOR.

19.   After several discussions and correspondence, Jaguar informed Lee that it intended to locate a new dealership in Braintree, Massachusetts and had extended an offer to Daniel Quirk.

20.   Although Braintree, Massachusetts was part of Lee's AOR, Lee ultimately informed Jaguar that it would not object to the placement of a new dealership in Braintree, Massachusetts, primarily as Lee did not desire a legal battle with Jaguar.

21.   Subsequently, by letter dated February 14, 2000, Jaguar informed Lee that it rescinded its offer to Daniel Quirk for a Braintree, Massachusetts location, but informed Lee that

Braintree, Massachusetts was still being considered as an open point for a new dealership. A true and accurate copy of the letter dated February 14, 2000 is attached hereto as Exhibit "B."

22. Based upon Jaguar's representations that Braintree, Massachusetts was still the open point for a new location, Lee continued to devote substantial resources to building its customer base in and around Norwood, Massachusetts, which was located closer to its dealership.

23. In January 2003, Lee received a Customer Footprint Map ("Footprint") breaking down customer sales and the average customer distance from Lee. The Footprint set forth that Lee's average customer distance was 19.44 miles and evidenced that a large percentage of Lee's customers were located in, or in close proximity to, Norwood, Massachusetts. A true and accurate copy of the Footprint is attached hereto as Exhibit "C."

24. In May 2003, Lee received notice that Jaguar intended to locate a new dealer in Hanover, Massachusetts, which was also within Lee's AOR and also in close proximity to the Braintree, Massachusetts location for which Jaguar was soliciting new dealers. A true and accurate copy of a letter dated May 1, 2003 is attached hereto as Exhibit "D."

25. After receiving notification from Jaguar that it intended to locate a new dealership in Hanover, Massachusetts, Lee inquired as to Jaguar's plans for Braintree, Massachusetts and questioned whether Jaguar's ulterior motive was to relocate the planned Braintree, Massachusetts location further to the south so that Jaguar could try to place another dealership in closer proximity to Lee. Specifically, Lee questioned why Jaguar's representations throughout more than a two-year period were being retracted and expressed concern that Jaguar intended to place a new dealership in the Norwood/E. Walpole, Massachusetts area, which would significantly impact Lee's customer base and violate the parties' agreement. A true and accurate copy of a

letter dated May 16, 2003 is attached hereto as Exhibit "E." Jaguar failed to provide any information to Lee and failed to discuss the "reasonable criteria" set forth in Jaguar's own self-serving letter dated October 22, 1993.

26. Jaguar subsequently opened a new dealership in Hanover, Massachusetts, which has been operating for approximately one year. As a result of the new dealership in Hanover, Massachusetts, Jaguar significantly reduced Lee's AOR and interfered with its customer base and/or potential customers. A series of three AOR maps are attached hereto as Exhibit "F," which depict the location of the respective dealerships and impact upon Lee's AOR. The last AOR Map includes a handwritten outline detailing Lee's purported new AOR and highlights both Norwood (02062) and Hanover (02339) to indicate their specific locations. Lee's initial estimates are that the Hanover dealership pilfers approximately 100 vehicle sales per year from Lee.

27. In response to additional inquiries from Lee, Jaguar acknowledged that it was abandoning its efforts to place a new dealership in Braintree, Massachusetts, but failed to provide Lee with additional information requested by Lee concerning Jaguar's overall plans or the criteria for making its decisions. A true and accurate copy of a letter dated May 26, 2003 is attached hereto as Exhibit "G."

28. Moreover, by letter dated August 25, 2003, Jaguar informed Lee that it planned to locate yet another new dealer called Jaguar Land Rover Norwood at 449 Neponset Street, Norwood, Massachusetts (the "Norwood Dealership"). A copy of the letter is attached to the Delaney Declaration, Exhibit 2. Notwithstanding Lee's requests, Jaguar has neither provided nor disclosed the operating agreement.

29.     Based upon Jaguar's own market penetration figures for year ending 1998, Lee's highest market penetration is for customers located approximately ten (10) miles from its dealership.

30.     The New Dealership is located within Lee's AOR, will have a significant adverse impact on Lee's enterprise value and asset base, will interfere with Lee's existing customer base or potential customers, and demonstrates that Jaguar is not using its best efforts to assist Lee in its operations as required by Section 2.2 of the Dealer Agreement.

Signed under the pains and penalties of perjury this 5th day of April, 2004.

_____
Christopher J. Lee, President of Lee
Imported Cars, Inc.